UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY ANN YOUNG,
    Plaintiff,

v.

NANCY A. BERRYHILL,
    Defendant.

Case No. 18-cv-01721-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

Plaintiff Mary Ann Young moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Young not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. [Docket Nos. 18 ("Pltf. Mot."), 20 ("Pltf. Reply").] The Commissioner cross-moves to affirm. [Docket No. 19 ("Def. Mot.").] For the reasons stated below, the court grants Young's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**I.    PROCEDURAL HISTORY**

Young filed an application for Social Security Disability Insurance ("SSDI") benefits on January 28, 2014, which was initially denied on June 3, 2014 and again on reconsideration on August 19, 2014. Administrative Record ("A.R.") 69-90, 94-100, 147-54. On August 21, 2014, Young filed a request for a hearing before an Administrative Law Judge ("ALJ"). A.R. 106-07. A hearing was held on June 9, 2016, at which Young was represented by an attorney. A.R. 33-68.

After the hearing, ALJ E. Alis issued a decision finding Young not disabled. A.R. 10-25. The ALJ determined that Young has the following severe impairments: history of cerebrovascular accident, migraine headaches, and gastrointestinal disorder status post surgeries. A.R. 15. The ALJ found that Young retains the following residual functional capacity ("RFC"):

> [T]he claimant ha[s] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and walk a maximum of four hours in an eight-hour workday, and sit for six hours in an eight-hour day. She could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. She could perform work that allowed her to sit and stand at will, but she would not need to leave the workstation and would not be off task. She should use a cane when ambulating more than 50 feet.

A.R. 16. Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform Young's past relevant work as a resident supervisor, the ALJ concluded that Young is not disabled. A.R. 20.

The Appeals Council denied Young's request for review on January 17, 2018. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Young then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

### III. FACTUAL BACKGROUND

#### A. Young's Testimony

Young was fifty-seven years old at the time of the June 9, 2016 hearing. A.R. 35. She testified that she had last worked in January 2010, as a residential assistant. A.R. 38. While she held that position, she would have "sporadic" headaches that would sometimes prevent her from working. A.R. 38. Young testified that she would miss work due to her headaches anywhere between once a week and an entire week. A.R. 39. Eventually, she and the management team agreed that it was in both their best interest if she resigned, as she faced the danger of injuring herself onsite due to her headaches. A.R. 39. Young stated that she had never before been terminated from any job. A.R. 39. She has not worked since she resigned from the residential assistant position. A.R. 40.

Young testified that her husband usually drives her places, such as to doctor appointments.

A.R. 41. She described herself as "paranoid, in terms of driving alone," since her headaches can cause her to become disoriented and lose some or all of her vision. A.R. 41. When she was working, she would often have to be taken home by a supervisor or a coworker, or have her husband come and pick her up. A.R. 55. She testified that she has been pulled over many times for erratic driving, including at least five times while she was employed as a residential assistant. A.R. 56. Young said that she is now "really cautious when it comes to driving, because [she has] no control." A.R. 56. "I get disoriented and I get nervous, and . . . once I get disoriented, I'm lost and I just don't know which direction to go," she explained. A.R. 56. However, she does occasionally drive short distances. A.R. 42. She said that the furthest she has driven in the last five years was about 10 minutes from her home. A.R. 42. Young testified that in the last five years, she has traveled out of the Bay Area once, when she went to Hawaii. A.R. 43. However, she stated that she was "bedridden with a migraine the entire time" and stayed in her room with the blinds and curtains drawn. A.R. 43.

Young testified that her headaches cause her to become disoriented, affect her concentration, increase her irritability, and make it difficult to be around people. A.R. 57. Light, noise, smoke, and smells can make her headaches worse. A.R. 57. When she has a headache, she becomes nauseous and cannot cook or eat anything. A.R. 57. She stated that she has lost between 30 and 35 pounds in the past year. A.R. 58. She said that she takes medication for her headaches, including preventative medication, medication that is meant to mitigate headaches, and medication for the vomiting or nausea that occurs with headaches. A.R. 43. Young represented that the preventative medications sometimes prevent headaches and sometimes they do not. A.R. 44. The other medication does not make her headaches go away faster. A.R. 44. She testified that most times she is not able to sleep because of the headaches, despite taking preventative medication before bed. A.R. 44-45. She stated that she gets an average of four hours of sleep a night, which leaves her with "absolutely . . . no energy" during the day. A.R. 60.

Young testified that she typically has a headache almost every day, and about fifteen or more headaches per month. A.R. 47. Young occasionally has injections to "break the cycle of a headache," particularly where the headache has persisted from one to five days. A.R. 46. She stated

4

that her most severe headaches, where she is bedridden or needs an injection, occur about six to eight times per month. A.R. 48. Young testified that the fastest amount of time that she can get a headache under control is about four hours. A.R. 60.

On an average day, Young will get up, take her medication, eat breakfast, and take a shower. A.R. 49. She stated that she makes her own breakfast. A.R. 49. When she showers, she uses a shower chair because she suffered a stroke in 2011 that "left [her] a little bit unsteady." A.R. 50. Typically, Young may try to do laundry or minor housework. A.R. 50. However, she testified that if she has a headache or did not sleep because of a headache, she is "absolutely worthless" and "may not even get up." A.R. 50. Her bedroom and family room are "completely dark" and "noise free," since any light or noise intensifies the pain. A.R. 58. She also uses ice and pressure to mitigate headache symptoms. A.R. 59. The only hobby Young identified was reading. A.R. 51.

### B. Vocational Expert Testimony

The VE testified that an individual with the same age, education, and work experience as Young and an RFC assessment as identified by the ALJ could perform Young's past relevant work as a resident supervisor. A.R. 63-67. However, the VE also testified that such an individual may no longer be employable in that position if she had one absence from work per month or was off-task more than 10% of the time. A.R. 67.

### C. Relevant Medical Evidence

The only challenge Young raises in this motion relates to the ALJ's credibility assessment with respect to her migraine symptoms. Accordingly, only the records that relate to Young's migraines are summarized here.

#### 1. Headache Questionnaire [March 2014]

Young completed a headache questionnaire on March 3, 2014. A.R. 198-99. She reported that she suffers from migraines "almost daily." A.R. 198. She described her symptoms as follows: "My vision blurs, I get nauseous, I start taking my pills. If no relief – I won't be able to tolerate sounds, light, or sit down. My head feels like it's in a vice. Feels like a pounding. Sometimes I vomit a lot." A.R. 198. She wrote that she cannot tolerate any noise or light once the headaches start, and she cannot lie down. A.R. 198. She attempts to relieve the symptoms by standing against

5

a wall and getting rid of any light or noise. A.R. 198-99. She also uses ice packs on her forehead and takes medication, but she stated that the "medications aren't really helping me anymore." A.R. 199.

Young wrote that the headaches last anywhere from a few hours to several days, and if they last as long as a week, she gets an injection of Toradal. A.R. 198-99. Young stated that she avoids situations that have a lot of noise (such as concerts or parties) or smoke (such as barbeques or fireworks). A.R. 199. She said she tries to avoid going out much, and if she does, she cannot stay out long at all. A.R. 199.

### 2. Function Report [July 2014]

Young submitted a function report dated July 29, 2014. A.R. 217-25. She stated that she is unable to work because of her headaches, which cause her to stay up all night or wake up multiple times each night. A.R. 217. She reported that sometimes she is unable to sit, and some headaches are so severe that she "might vomit several times over an hour." A.R. 217

Young reported that, on a daily basis, she mostly rests, tries to take care of herself, and does as much as she can around the house. A.R. 218. She said that she has no problem with completing her personal care, such as bathing and feeding herself. A.R. 218. She prepares her own food, although she cannot cook or eat anything if she is experiencing a headache. A.R. 219. Young listed her hobbies as reading, crosswords, puzzles, and cooking shows. A.R. 221. She reported that she only does "light" household chores, and must go slow and pace herself. A.R. 219. She wrote that she avoids strenuous work or lifting, even garbage or laundry, because bending or lifting can make her dizzy. A.R. 217. She said that she does not do a lot of chores because of the pain. A.R. 217.

Because of her headaches, Young no longer goes anywhere with noise or smoke, such as barbeques or restaurants; makes social plans; or drives over 10 miles by herself. A.R. 218. However, she stated that she goes outside almost every day unless she has a headache. A.R. 220. She goes shopping about once a week for an hour. A.R. 220. She sometimes visits her friends or family and she attends church about once a week. A.R. 221.

### 3. Kaiser Permanente Records [April 2010 – May 2016]

On June 5, 2010, Young presented for an office visit at Kaiser with a chief complaint of a

migraine headache. A.R. 255. She told the treating physician that she was experiencing "throbbing pain." A.R. 256. The doctor refilled her headache medication, butalbital, and told her to schedule a follow up with her primary care physician. A.R. 256. Young was instructed to return if symptoms worsened or failed to improve. A.R. 257.

About three weeks later, on June 28, 2010, Young returned for a medication management appointment. A.R. 259. The treatment notes record that Young "[c]omplains [of] a lot of headaches," and that she reported having them about 4-6 times per month. A.R. 260. Young told the doctor that she experiences nausea and sensitivity to light with her headaches, and that they sometimes wake her up. A.R. 260.

Young presented for an office visit to Kaiser's Headache Clinic on July 15, 2010, again complaining of a migraine headache with associated nausea and vomiting. A.R. 268-70. She reported that she also experienced numbness in her face and left arm. A.R. 270. Butalbital did not relieve the headache. A.R. 270. She reported that she had been experiencing an increased migraine frequency recently. A.R. 269. She was given an injection of Toradol and antinausea medication and told to take prednisone if the injection did not work. A.R. 269. The providers at the Headache Clinic developed a treatment plan for her future headaches, which included increasing her dose of nortriptyline; using butalbital for an initial headache; taking oxycodone if the butalbital failed; getting an injection of Toradol if the oxycodone does not work; and then using prednisone if the injection failed. A.R. 269.

On December 12, 2010, Young's husband, niece, and friend took her to the emergency department because she appeared to be in an altered mental state. A.R. 290, 298. Young's niece told the providers that Young had been disoriented for the past two days, and that she had also exhibited slurred speech and aphasia. A.R. 290. They also stated that she had had headache for three days. A.R. 298. Young's friend reported that Young had begun acting strangely recently. A.R. 298. Young had been waking up "somewhat normal," and then "throughout the course of the day she starts to act more and more like she's drunk with slurred speech, falling asleep at the table and missing her mouth when trying to bring food up." A.R. 298. The previous night, Young's husband had found her standing in front of their gas stove with one burner on, burning an empty

7

pot, and another burner on but not lit. A.R. 298. She had repeated this behavior for three nights in a row, telling her husband that she needed to be in front of the stove to "stay warm." A.R. 298. When her husband asked her to stop, Young became "defiant," which is out of character for her. A.R. 320. Young also attempted to clean the stove with motor oil cleaner in a poorly ventilated room. A.R. 298. Following these incidents, her husband removed the stove from their house. A.R. 298.

On examination, Young was not tracking her gaze and had an ataxic gait. A.R. 290. The notes record "some abnormal behavior and transient word finding difficulty," along with sensitivity to light. A.R. 293. Young told the examining physician that she thought the year was 2008. A.R. 290. She reported that she has a history of migraines but that this one was more severe than usual. A.R. 292. She told her providers that she takes butalbital for headaches at home without relief. A.R. 293. According to Young, she had been suffering from a headache for four days. A.R. 293. Young also told the doctors that she "stays awake for days on end" because she is afraid that she will have a stroke in her sleep. A.R. 298. She was discharged the following day with instructions to continue home migraine medications and to return to the hospital if her symptoms returned. A.R. 318.

Young presented for a follow up office visit on January 3, 2011. A.R. 411. She reported doing better, although she said she was still getting headaches up to several times a week and some are aggressive enough to wake her up. A.R. 411. She told the doctor that Excedrin and butalbital bring the intensity of her headaches down, but do not necessarily make it go away. A.R. 411-12. If she is nauseous, she throws up the pills. A.R. 412. The physician wrote that Young's migraines need better prevention. A.R. 412. He also noted that they are "loosing [*sic*] some ground here" with respect to Young's insomnia. A.R. 412. He increased her dosage of notritpyline and prescribed another medication for nausea. A.R. 412. In January 2012, Young received an injection for a migraine. A.R. 28.

Young was next seen for headaches on June 21, 2013. A.R. 1061. She reported having headaches more than half the days of the month. A.R. 1062. She stated that she can function with a headache on most days, but some can be incapacitating. A.R. 1062. She also said that the headaches had started accelerating from none to severe more quickly, and that there had been an

8

increase in the frequency, duration, and intensity of the headaches since January. A.R. 1062. The treatment plan included stopping the use of Excedrin, reducing the use of butalbital, using a headache calendar, and increasing her dose of nortriptyline. A.R. 1062.

Young returned for headache treatment on February 26, 2015. A.R. 1108. She reported that she had four severe headaches in last two months, and that these had been more severe than in the past. A.R. 1108. She told the treating provider that the headaches had been severe for about four hours and "then goes for up to several days." A.R. 1108. She also stated that she still had chronic, more mild headaches. A.R. 1109. According to Young, she had been woken up in the middle of the night due to migraine pain every night for weeks. A.R. 1109. She reported she had tried a prescription for verapamil, which did not work, and that the nortriptyline is not fully controlling. A.R. 1109. The physician increased her dose of notriptyline again and told her that she can use propranolol and topiramate if necessary. A.R. 1109. He also permitted her to keep taking butalbital with codeine once a week or less. A.R. 1109.

On September 3, 2015, Young saw another physician for a "second opinion" about her headaches. A.R. 1112. She reported that her migraine headaches began when she was a teenager and that now they are a daily occurrence. A.R. 1112. She also stated that she experiences nausea and sensitivity to light and sound during a headache episode. A.R. 1112. According to Young, her headaches had been especially severe for the last six months and she was having almost daily severe headaches that were sometimes keeping her up at night. A.R. 1113. The physician prescribed Topamax in addition to her nortriptyline. A.R. 1116. She also instructed Young to not use any single class of analgesic more than two or three days a week due to possible medication overuse headaches. A.R. 1116.

Young presented to the Kaiser emergency department for a severe headache on May 23, 2016. A.R. 1136. She reported that the headache had started four hours prior and was accompanied by nausea, dry heaving, and sensitivity to light. A.R. 1137. She told the treating provider that she usually gets a headache "almost every day," and that they had become worse over the past couple of weeks. A.R. 1137-38. Young was discharged the same day. A.R. 1137.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." A.R. 17. Young argues that the ALJ erred in discounting her subjective reports about the severity of her headaches, and that if her testimony were properly credited, he could not conclude that she is capable of performing her past relevant work as a resident supervisor.

## VI. DISCUSSION

The determination of whether or not to accept a claimant's testimony regarding subjective

symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Diedrich v. Berryhill*, 874 F.3d 634, 641 (9th Cir. 2017) (citing *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012)). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Diedrich*, 874 F.3d at 641. If the claimant has presented "objective medical evidence of an underlying impairment," and there is no evidence that the claimant is malingering, then "the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (internal quotation marks and citations omitted). The ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 343, 346-47 (9th Cir. 1991) (en banc) (citations omitted). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (quotations omitted). In this case, the ALJ found that Young's medically determinable impairments could reasonably be expected to cause the alleged symptoms. A.R. 17. He did not make a finding that Young is malingering. Therefore, he was required to give "clear and convincing" reasons to discount Young's testimony.

Young contests the ALJ's credibility assessment with respect to her migraine headaches. She testified that she is incapacitated by severe headaches six to eight times per month. A.R. 48. According to the vocational expert, an individual who missed even one day of work per month or was off-task 10% of the time may not be employable under the hypotheticals relating to Young's prior relevant work as a residential supervisor. A.R. 67. Young argues that if her testimony about the severity of her headaches were credited, she would be found unable to perform that position.

In discounting Young's testimony, the ALJ noted that Young is "able to drive short distances, care for her personal hygiene, do light household chores, and prepare simple meals." A.R. 17. He wrote that Young was able to shop in stores and handle money. A.R. 17. "Some of the physical and mental abilities and social interactions required in order to perform these activities are

11

the same as those necessary for obtaining and maintaining employment," he observed. A.R. 17. The ALJ also provided a summary of the medical evidence relating to Young's headaches. A.R. 18. He pointed out that there are some lengthy gaps in Young's treatment records, such as a period from January 2012 to June 2013 where Young apparently did not receive additional treatment relating to her headaches. A.R. 18. He also cited a record from Young's June 2013 appointment that notes that she can function with a headache on most days. A.R. 18. Finally, the ALJ referred to Young's February 2015 records where Young reported that she had four severe headaches in the last two months. A.R. 18.

The ALJ's summary of the medical evidence obscures several key points. First, although the June 2013 notes reflect that Young can function with a headache on "[m]ost days," she also reported at that time that some of her headaches are incapacitating. A.R. 18, 1062. Second, the ALJ incorrectly interpreted Young's February 2015 records. He wrote those notes reflect that Young had only "four headaches in the last two months" and that these four headaches "had lasted four hours and then were gone." A.R. 18. In fact, Young reported that she had had four *severe* headaches in the last two months, not that those were her only headaches during that time period. A.R. 1108. In that same visit, she also stated that she had been woken up from her sleep due to migraine pain almost every night in the past few weeks. A.R. 1109. Further, the notes do not say that the headaches subsided after four hours (as characterized by the ALJ) but rather that the headaches are "[s]evere for 4 hours and then goes for up to several days." A.R. 1108. The context of this statement makes it clear that the headaches persisted for days at a lower severity, not that they vanished after four hours. A.R. 1108. Finally, the ALJ neglected to address two more recent records relating to Young's headaches. In September 2015, Young saw another physician for a "second opinion" about her headaches. A.R. 1112. At that time, she reported that her migraine headaches were a daily occurrence. A.R. 1112. She also said that they had been especially severe for the last six months and that she was having "almost daily severe headaches." A.R. 1113. In addition, Young presented to the Kaiser emergency department for a severe headache on May 23, 2016, which was less than a month before her hearing before the ALJ. A.R. 1136-37. She told the treating provider that her headaches had become worse over the past couple of weeks. A.R. 1137-38.

In sum, the ALJ's discussion of Young's headaches mischaracterized some of the medical evidence and failed to address the two records closest in time to the hearing, in which Young sought treatment and reported that her symptoms had become worse. The ALJ therefore did not offer clear and convincing reasons to discount Young's testimony as to the severity of her symptoms. This constitutes error and requires remand.

## VII. CONCLUSION

For the foregoing reasons, the court grants Young's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 27, 2019



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

13